**JAYLEEN TUUFULI, a Minor, by Her Guardian Ad Litem, MOLIA TUUFULI, Plaintiff**

**v.**

**AMERICAN SAMOA GOVERNMENT and TASIMANI ATUATASI, Defendants**

High Court of American Samoa
Trial Division

CA 93-90

November 5, 1993

Before RICHMOND, Associate Justice, and BETHAM, Associate Judge.

Counsel:        For Plaintiff, Afoa L. Su'esu'e Lutu
                    For Defendants, Elvis R.P. Patea, Assistant Attorney General

Plaintiff Jayleen Tuufuli ("Jayleen"), by her mother Molia Tuufuli as guardian ad litem, brought this action to recover damages for personal injuries from defendants American Samoa Government ("the Government") and Tasimani Atuatasi ("Tasimani"). Trial took place on July 29 and 30, 1993.

## FINDINGS OF FACT

Jayleen was injured on October 12, 1988. She was then 11 years of age and was attending the Government's elementary school at Pago Pago, American Samoa. About 2:00 p.m., after school adjourned, she boarded a Government school bus, parked nearby for the first pick-up of students to take home. The bus was operated by Tasimani in the scope of his employment with the Government.

This bus is a large model, with a capacity in excess of 60 passengers when some stand in the aisle. On the occasion at issue, all seats were apparently occupied and students were standing in the aisle. Jayleen was seated near the back of the bus. Normally, Tasimani made two successive, after-school bus trips from Jayleen's school. However, on this occasion, he had to proceed directly to Samoana High School in Utulei after only one trip to pick up high school students.

With this full load of students on board, Tasimani drove the bus to his first stop at the area in front of the Congregational Christian Church and behind the Courthouse in Fagatogo. Upon stopping, he left the bus through the right front door, and the students started disembarking through this same door.

Easter Tarrent ("Easter") was one of those students. She was seated near the middle of the bus and exited before Jayleen. She did not see Tasimani leave or, at that time, anywhere outside the bus. In fact, another student said the emergency back door of the bus was open, and Tasimani went there to close it. A number of students did manage to jump out of the rear exit before Tasimani closed this door and cleared the students away from this area.

25

Meanwhile, the students inside the bus and moving towards the front door were shoving those ahead of them to hasten their departure. Easter was still near the front door as Jayleen stepped out. While her left foot was on the first step down and her right foot was on the next step down, Jayleen was pushed from behind and fell to the pavement. She landed with a portion of her left leg still on the steps. Before the exiting students realized that Jayleen was hurt, at least two of them jumped over her, and one of them struck her left leg.

Easter assisted Jayleen, who was only able to move by hopping on her right leg, to the steps of the church, about 30 feet from the bus, and, after awhile, towards Jayleen's home in the hills of Fagatogo behind the church. En route, however, a motorist stopped and took Jayleen the rest of the way home. From there, she was taken to the Government's medical facility at Faga'alu.

While Jayleen, crying in pain, and Easter, trying to comfort her, were still seated on the church steps, Tasimani returned to the front of the bus. Either he did not notice the two girls, or he disregarded them. By that time, the bus was almost empty, and he soon drove off. He claimed that he was unaware of Jayleen's accident until the following day.

At the time of the accident, Tasimani was 60 or 61 years old with 29 years of employment as a vehicle operator with the Government. He had driven vehicles for the fire department and the departments of health and education during this career. He was a school bus driver for four or five years immediately before retiring in late 1988.

He had attended school bus driver's education classes for about two or three weeks, but he only specifically recalled instruction on the use of flashing lights and reporting incidents when drivers of other vehicles disregard this signal. He did not recall receiving any written instructions, only oral directions from the manager of the pupil transportation program. His recollections of the bus driver's responsibilities given in these verbal directions were, essentially, to control students' behavior in the bus, oversee from an outside vantage point orderly exit from the bus by students, and keep the rear exit closed except at his direction in emergencies.

■■ The manager of the pupil transportation program, who has been in this position for some 13 years now, presented two sets of written instructions issued by his office, one in the 1980s and the other in 1989. The earlier instructions indicate that no student shall sit in the driver's

seat. The later set requires the driver to remain in the driver's seat when loading and unloading pupils. This set also explicitly recognizes the potential dangers lurking at the rear emergency exit. The manager insisted that these existing policies were explained to all school bus drivers and believed that Tasimani was educated in this manner.

Setting aside the question of Tasimani's actual knowledge of either set of written rules, and the duties that they clearly placed upon school bus drivers, he knew and clearly understood his duty to care for the safety of students embarked on any bus trip under his control. In particular, he was aware of the purpose and operation of the flashing light system. The bus's engine must function to activate that system. A reasonably prudent person would not vacate the driver's station with the engine running, inviting a student to operate the bus. Moreover, the crowded condition of the bus called for exit control from a location within, not outside, the bus. An ordinarily prudent person would not alight from the bus for this purpose, even if he failed to activate the flashing lights on this occasion. While a few students exiting from the rear door may have been an attractive diversion, it did not justify leaving his duty post, whether that assigned station was in the driver's seat or outside the front door. The fact that adolescent youth and younger children are often thoughtless and impulsive only increases the degree of vigilance and caution which a school bus driver ought to exercise towards student passengers.

Tasimani breached his duty for Jayleen's safety. His failure to exercise the reasonable or ordinary standard of care required of him was a cause, in the natural and continuous sequence of events, leading to her injuries, without which the injuries would not have occurred. Jayleen was not negligent.

Dr. Vaiula Tuato'o testified to Jayleen's injuries. When he first examined her on October 12, 1988, she was in severe pain and her left hip was immobile.[1] X-rays revealed an acute fracture at the epiphysis or growth plate, resulting in slippage of the head or cone off of the left femur or thighbone. On October 17, 1988, following a medical team consultation, the cone was surgically pinned back in place with three knowles pins. This kind of operation takes one hour and 30 minutes to

---

[1] The evidence, including x-rays, observation of Jayleen's movements in the court room, and testimony, clearly established injury to the left leg. We do note, however, Dr. Tuato'o's medical reports of May, 1989, and April 2, 1992, and his outpatient record notes of March 25, 1992, which were carelessly and erroneously prepared to identify the right leg as the injured limb.

one hour and 50 minutes to perform here. Jayleen's pain remained intense for three to four days afterwards.

Jayleen was hospitalized until November 4, 1988. Her stay was extended due to reinjury. While recuperating from the first operation, she was given crutches but was not ready for their use and fell on October 24, 1988.[2] The cone again slipped, requiring a second operation on October 27, 1988, to relocate and pin it into the correct position. While hospitalized and after discharge, Jayleen followed a prescribed, physical therapy program.

Jayleen's injury is relatively rare, but does happen with some frequency in the 10 to 15 year-old age group while physical development is still maturing. Unless the cone is returned to its correct location it will die, leaving the injured person severely crippled. Even with surgical repinning and eventual fusion, serious consequences are present.

Dr. Tuato'o conducted follow-up examinations in May 1989, March 1992, and July 1993. By March 1992, the fracture was completely ossified, but the cone was partially flattened. Jayleen's right thigh is firm, but her left thigh is somewhat wasted and needs strengthening workouts. The range of movements in her left hip was significantly reduced from normal but gradually improved over the course of these examinations. The doctor rated the disability of her left leg, due to the hip condition, at about 50% on the first occasion and at 26% and 27% on the second and third occasions.

Jayleen also experienced trauma to her left knee in the accident. This injury produced Osgood-Schlatter disease, an inflammation of the tibia, or larger bone in the lower part of the leg, near the knee joint. The inner tendon pulled the bone up, causing Jayleen's left leg to be one inch shorter than her right leg, and increasing, in the doctor's opinion, the total leg disability by 10% to a total partial disability of approximately 37% at the present time. The difference in leg lengths causes a slight limp. Jayleen needs a special shoe to overcome this limp, reduce backaches, and prevent the spine from bending abnormally to compensate for the shorter leg. However, these shoes must be uniquely fitted outside of American Samoa.

---

[2] Dr. Tuato'o at least intimated that lack of adequate supervision by the nursing personnel present was also a causal factor in this second fall.

Osteoarthritis of the left hip is now present, and as Jayleen ages, bone and cartilage degeneration in this area will worsen. She faces the probable prospect of two or three more operations in the future. Fusion is now complete, and whenever Jayleen is ready, the three pins can be removed, or may permanently remain, or some may be removed to help guard against another break. When she is in her 30s or 40s, the cone may need to be relocated again. During her 50s or 60s, total hip replacement will probably be required to deal with increasing arthritic pain and immobility, bearing in mind that these artificial parts presently have a limited life expectancy of 10 to 15 years.

Jayleen's left thigh is necessarily scarred. Future surgery will only add to this disfigurement. Because her hip movements are less supple, she may have trouble giving birth.

Jayleen confirmed her intense pain immediately after the accident and during the days immediately following. Her arthritic condition is now painful. She was active athletically before the accident, but her recreational participation is now very limited. Her physical abilities are restricted to non-weight bearing activities, a little housework and watching young children.

Jayleen was doing well in school prior to the accident. Afterwards, however, she began to lose interest, and her grades became below average and even failing. Student kidding about her "crooked" leg probably contributed to this development. She is not attending school now because she is "always late," but she wants to finish high school when she suffers less pain, and she currently tries to do some home study. She is sleepless some nights due to pain. She wakes up in pain and with numbness almost daily and requires pain medication. After subsiding, pain often recurs, particularly after sitting for a lengthy time or walking. Jayleen genuinely fears the future.

Taking into account the various elements contributing to the pain, discomfort, fears, anxiety and other mental and emotional distress suffered by Jayleen, including but not limited to the effects of her permanent disfigurement and partial disability, reasonable compensation for this pain and suffering is $50,000.

Jayleen was hospitalized for 23 days. The three examinations by Dr. Tuato'o are the only other past medical visits or charges specifically identified by the evidence. Jayleen is entitled to medical attention free of charge and is subject only to charges for the use of the Government's

29

medical facilities under A.S.C.A. § 13.0601. In her situation, the inpatient charge of $7.50 per day and the outpatient charge of $2.00 per visit at the Government's medical facility, established by administrative rule and codified in A.S.A.C. § 11.0302(a)(1) and (2), are applicable. Thus, paid medical expenses are $172.50 for inpatient charges and $6.00 for outpatient charges, a total of $178.50.

Except for surgical hip replacement, the future operations will probably be performed locally. Although inpatient and outpatient charges are likely to rise, no evidentiary foundation for the amount of any increases was presented. Using the present rates, and finding that 24 inpatient days and six outpatient visits are plausible estimates for at least two future operations performed locally, at this time a reasonable assessment of these future medical expenses is $192.00. Dr. Tuato'o testified that if present circumstances continued, the surgical hip replacement would be performed outside American Samoa at a cost of $7,000 to $10,000. Using the higher figure for this third operation as reasonable, Jayleen's prospective medical expenses are $10,192. Thus, her total medical expenses are $10,370.50.

## CONCLUSIONS OF LAW

1. Tasimani was negligent in performing his duties as a school bus driver for the Government, and his negligence proximately caused Jayleen's injuries.

2. Since Tasimani was operating the bus in the scope of his employment, the Government is liable for Jayleen's damages. Her remedy against the Government is exclusive with respect to Tasimani. A.S.C.A. § 43.1211.

3. Jayleen was not negligent. Thus, the comparative negligence principle, set forth in A.S.C.A. § 43.5101, is not applicable, and the Government is liable for the entire amount of Jayleen's damages.

4. Jayleen's general damages for pain and suffering, including disfigurement and permanent partial disability, are $50,000, and special damages for medical expenses are $10,370.50. Her total damages are $60,370.50.

5. In accordance with *Judicial Memorandum No. 1-1988*, 7 A.S.R.2d 144 (1988), until further order of the court, the amount of the damages shall be deposited directly into the depositary of the High Court of

American Samoa and shall be placed in an interest bearing account with Jayleen as the beneficiary. Disbursements will be made only on application of Molia Tuufuli as guardian *ad litem*, or by her successor of record, and only on approval by one of the justices.

Judgment shall enter accordingly.

It is so ordered.

